586

*In re* K.S. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Leslie Smith, Respondent-Appellant).—*In re* K.S. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Walter Smith, Respondent-Appellant).—*In re* K.S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Leslie Smith, Respondent-Appellant).—*In re* K.S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Walter Smith, Respondent-Appellant).

Fourth District Nos. 4—90—0021, 4—90—0022, 4—90—0140, 4—90—0141 cons.

Opinion filed September 25, 1990.

Larry Silkwood, of Urbana, for appellant Leslie Smith.

Lynne R. Feldman, of Kirtley-Pavia-Marsh, of Urbana, for appellant Walter Smith.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and Rebecca L. White, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Betsy Bier and James Kuehl, Assistant Public Defenders, of Urbana, guardians *ad litem*.

JUSTICE STEIGMANN delivered the opinion of the court:
■ Section 1(D)(m) of the Adoption Act (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(m)) defines "unfit person" as "any person whom the court shall find to be unfit to have a child" because of the "failure by a parent to make reasonable efforts to correct the conditions which were the basis for the removal of the child from such parent, or to make reasonable progress toward the return of the child to such parent within 12 months after an adjudication of neglected minor, abused minor or dependent minor under the *** Juvenile Court Act of 1987." These consolidated cases raise this question: Does section 1(D)(m) apply to a parent who has failed to make reasonable progress toward the return of a child even though that parent is not the parent who earlier had been found to be abusive or neglectful of the child in question? We answer that question in the affirmative and, for the reasons later discussed in this opinion, we affirm the orders of the trial court terminating the parental rights of both parents as to all three children and appointing a guardian with the authority to consent to their adoption.

I. The Procedural History Of The Case
On May 12, 1988, the State's Attorney of Champaign County filed a three-count petition alleging neglect under the Juvenile Court Act of

1987 (Juvenile Court Act) (Ill. Rev. Stat. 1989, ch. 37, par. 801—1 *et seq.*). Leslie Smith and Walter Smith, the appellants in these consolidated cases, were designated the respondent parents in that petition, and their three children were designated the respondent minors. (Because the children all have the same initials—K.S.—we will refer to them by the first two letters of their first names.) The three respondent minors in the May 1988 petition and their ages at that time are KW, then seven years old; KY, then four years old; and KA, then five months old. Count I of the petition alleged that KW was neglected by reason of being a minor under 18 years of age whose parent, Leslie Smith, "does not provide the minor the education required by law." (Ill. Rev. Stat. 1989, ch. 37, par. 802—3(1)(a).) Count II alleged that all three children were neglected by reason of being minors under 18 years of age whose parent, Leslie Smith, "does not provide the proper or necessary support for the said minors." (Ill. Rev. Stat. 1989, ch. 37, par. 802—3(1)(a).) Count III alleged that all three children were neglected by reason of being minors under 18 years of age "whose environment is injurious to their welfare when they reside with their mother, Leslie Smith." (Ill. Rev. Stat. 1989, ch. 37, pars. 802—3(1)(a), (1)(b).) None of these three counts made any reference to allegations of abuse or neglect committed by respondent father, Walter Smith.

In October 1987, Walter Smith was imprisoned due to his conviction for possession of a controlled substance, cocaine, with intent to deliver. However, in May 1988, when the neglect petition was filed, Walter was a work-release prisoner in the Urbana Community Correctional Center of the Illinois Department of Corrections.

A shelter-care hearing was held on May 12, 1988. At its conclusion, the minors were ordered placed in the temporary custody of the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).

All five respondents were served with summons, separate counsel were appointed for the respondent parents, Walter and Leslie, and a guardian *ad litem* was appointed for the respondent minors.

On June 22, 1988, the adjudicatory hearing on the neglect petition was conducted, and the court entered findings in favor of the petitioner on counts I and III, finding the children to be neglected. However, the court entered a finding against the petitioner on count II. Both Walter and Leslie were present at the adjudicatory hearing with their respective counsel. At the conclusion of the adjudicatory hearing, DCFS was ordered to conduct a home and background investigation and to prepare a written dispositional report for use at the dispositional hearing, which was then allotted for July 26, 1988. The court

also directed that the shelter-care order remain in full force and effect pending the dispositional hearing.

Because the finding that these children were neglected minors is not before us on appeal, we only need to review the evidence presented at the adjudicatory hearing on the neglect petition to the extent necessary to put subsequent proceedings into context. A portion of that evidence demonstrated that on at least one occasion drugs and drug paraphernalia were lying about the house, along with 20 to 25 razor blades, at a time when the children were playing inside the premises with access to these items. On other occasions, the children, including then two-year-old KY, were permitted to play outside the house without any supervision. Further, when KY was three years old, she was locked in the family's residence with no one else inside. There was also evidence presented that Leslie went shopping with three-year-old KY to a local K mart at a time when Leslie was in such a drug stupor that she was unable to stand, lying instead across her shopping cart for support. The police officer who was called to the scene testified that Leslie was under the influence of drugs and barely able to keep her eyes open as she conversed with the officer.

At the dispositional hearing conducted on July 26, 1988, Walter and Leslie were again present with their respective counsel. The court formally adjudicated all respondent minors to be wards of the court and appointed the guardianship administrator of DCFS as guardian of the minors with the power to place them. In accordance with section 2–27(1) of the Juvenile Court Act (Ill. Rev. Stat. 1989, ch. 37, par. 802–27(1)), the court specifically found that "the respondent mother is unfit for reasons other than financial circumstances alone, to care for, protect, train or discipline the respondent minors *and the respondent father is unable to do so.*" (Emphasis added.)

At the conclusion of the dispositional hearing, the court set forth detailed directions to the respondent parents of what they must do in order to have their children returned from foster placements. Before stating those directions, however, the court spoke directly to the parents and stated, in part, the following:

> "[M]y concern here for Mr. and Mrs. Smith is that Mr. Smith won't allow his own rather unrealistic view of his marriage and Mrs. Smith's use and abuse of controlled substances, to cost him his children. If things aren't corrected and corrected very quickly, Mr. Smith's going to end up in my judgment, without a wife and without his children. * * *
>
> I am * * * absolutely convinced that Mrs. Smith has serious ongoing drug problems and drug dependency that is in serious

need of attention. *** And, the volume of evidence that I heard at the adjudicatory hearing, all indicated someone who is having a terrible struggle with drugs. *** The first ray of hope I would see here would be a genuine admission by Mrs. Smith she's got a drug problem. Without that step, I see no hope for any progress from Mrs. Smith. And, I see no hope for return of the custody of the children to her.

That, of course, gives Mrs. Smith a real tough decision to make. It gives you a real tough decision to make, Mr. Smith. And, unless and until Mrs. Smith acknowledges she's got a drug problem, *** she's not even going to come close to a return of the children to her custody. And, that leaves me with the only alternative of your custody, at such time as you're finally released from the work release program and in a position to exercise custody.

*Now, I am just warning you, you may be looking at the very unpleasant and, frankly, horrible choice of living with your children or living with your wife. But, right now, you're not going to be able to do both.* *** Unless Mrs. Smith starts to address the problem, I'm not sending those children back to her.

\* \* \*

And, what I mean is this, and it's real important that both you and Mr. Smith understand this. The law provides that where children are removed from the custody of parents, and the parents fail to make reasonable efforts to correct the problems, and the parents fail to make reasonable progress towards correcting the problems, *** for 12 months from the date that the judge found the children were abused or neglected, the State has the right to come to court and ask that judge to terminate parental rights and authorize the Department of Children and Family Services to consent to the child's adoption. What that means is, *if you fail to make reasonable progress, if you fail to make reasonable efforts, either one, after a year from the adjudicatory hearing,* the last hearing, *the State can come in and ask that I terminate your parental rights.* If that happens, you have no more right to ever see these children again, to have any contact with them, to hear from them, to know whether they're alive or dead, sick or well, adopted or in foster care." (Emphasis added.)

The court then appropriately admonished both respondent parents of their right to appeal the court's findings and its placement of the children in foster homes. However, no appeal of those orders was ever taken by either parent.

On September 25, 1989, the State's Attorney filed a petition seeking a finding of unfitness and a termination of the parental rights of both respondent parents. That petition alleged that Walter and Leslie were unfit persons within the meaning of section 1(D)(m) of the Adoption Act because they had failed to make reasonable progress toward the return of their children to them within 12 months of the adjudication of neglect. On October 31, 1989, the State's Attorney filed a count II to the supplemental petition, alleging that Walter was an unfit person under section 1(D)(*l*) of the Act, "because he has failed to maintain a reasonable degree of interest, concern or responsibility" as to the respondent minors. Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(*l*).

The adjudicatory hearing on the supplemental petition was conducted on October 31, 1989, and both respondent parents, having been duly served, appeared personally and by their separate counsel. At that hearing, the court found by clear and convincing evidence that both respondent parents were unfit persons within the meaning of section 1(D)(m) of the Act, "because they have failed to make reasonable progress toward the return of the above-named minors to them within 12 months of the adjudication of neglect." The court found against the petitioner on count II.

At the conclusion of the dispositional hearing on December 28, 1989, the court entered an order terminating the parental rights of both Walter and Leslie as to respondent minors KY and KA, finding that it was in the best interests of these minors that all parental rights be terminated.

Because KW was nine years old at the time of the dispositional hearing, he was aware of the nature of that hearing and, through his counsel, stated his wish that he not be placed for adoption. KW also wished to remain with his sisters. KW's lawyer said KW was fearful of not seeing his sisters again.

Based upon these representations and some indications that perhaps Walter and Leslie were beginning to change their behavior, the court granted the parents' request that the dispositional hearing as to KW be continued until February 20, 1990. The court stated its hope that it might find, based upon the activities of the respondent parents in the interim, that their parental rights as to KW need not be terminated. However, after receiving reports and further evidence at the February 20, 1990, dispositional hearing, the court made the same findings regarding KW that it had earlier made with regard to KW's sisters, thereby terminating the parental rights of both Walter and Leslie as to KW. The orders terminating their parental rights as to all three children are the subject of these consolidated appeals, the De-

cember 28 order as to KY and KA in appeal Nos. 4—90—0021 and 4—90—0022, and the February 20 order as to KW in appeal Nos. 4—90—0140 and 4—90—0141.

## II. The Termination Of The Parental Rights Of Leslie Smith

■ Leslie argues that the trial court erred in finding her to be an unfit parent under section 1(D)(m) of the Adoption Act and also erred in finding that it was in the best interests of the respondent minors that a guardian be appointed with authority to consent to the adoption of each. This court in *In re Boolman* (1986), 141 Ill. App. 3d 508, 511-12, 491 N.E.2d 1, 3, stated the following:

"A finding of unfitness as the basis for termination of parental rights must be supported by clear and convincing evidence [citation], but will not be disturbed by the reviewing court unless against the manifest weight of the evidence. [Citation.]

In order for respondents to make 'reasonable progress' [under section 1(D)(m) of the Adoption Act] toward the return of a child, they must make a minimum measurable or demonstrable movement toward that goal."

We will apply these standards in reviewing the trial court's orders.

*A. The Trial Court's Finding That Leslie Had Not Made "Reasonable Progress" Toward the Return of the Children.*

At the conclusion of the adjudicatory hearing on October 31, 1989, concerning the petition to terminate parental rights, the trial court made extensive findings based upon the evidence it had heard. Instead of setting forth in this opinion the evidence presented at that hearing, we will quote from portions of the trial court's findings:

"When this case began, the respondent mother was obviously dependent on substances, and the respondent father, of course, was incarcerated. The question is, what progress has been made since then by the parents to supply a drug-free, safe, nurturing home for these children and is that progress reasonable? * * * [T]he uncontradicted evidence establishes * * * that when the respondent mother was [recently] advised that one of her urine tests yielded a positive result, she acknowledged that she was, indeed, using cocaine, but had cut down substantially. I believe that illustrates rather graphically that the respondent mother has not made progress, reasonable or otherwise. She was addicted to cocaine when this case began, she's addicted now. * * * [S]he has not pursued the aftercare [treatment for her cocaine addiction] that was so urgently offered to her by the Depart-

ment of Children and Family Services [and others] \*\*\*. Unfortunately, she's in no better position today than she was when this case began.

\*\*\* I don't think anyone could suggest that I could return any of these children to her custody at this time, leaving aside the fact that she is now living in a hotel. Certainly the adverse financial situation in which the respondent mother has found herself throughout the pendency of this case, at one point having her power shut off and now living in a hotel, would suggest that the family funds which have regularly been produced, apparently, by Mr. Smith since he's been on work release, have been going to something other than housing, and something other than power bills."

The trial court also noted that Leslie in the past had been so heavily into drug abuse that she was unconscious or semi-comatose much of the day and the children were left to fend for themselves with predictable results.

■ We agree with the trial court that Leslie had failed to make "reasonable progress" toward the return of these children within 12 months after the adjudication of their neglect. Leslie's abuse of drugs led not only to the neglect of her children, but endangered them as well. Yet despite the warnings of the trial court and the best efforts of DCFS workers and drug treatment counselors to get Leslie to change her life and kick her drug habit, she had clearly and convincingly demonstrated that she was either unable or unwilling to do so. The trial court's finding that Leslie had made no progress towards the return of these children by correcting the circumstances that led to their removal is not contrary to the manifest weight of the evidence.

B. *The Trial Court's Finding That It Was in the Best Interests of the Minors That Leslie's Parental Rights Be Terminated.*

Leslie further argues that even if the trial court's finding that she was an unfit person under section 1(D)(m) of the Adoption Act were correct, the appointment of a guardian with authority to consent to the adoption of her children, thereby terminating her parental rights, was in error. Leslie argues that while a parent may be found to be unfit to have the current custody of a child, "that does not necessarily mean that said parent cannot remain the child's legal parent with the future possibility of the return of the child to that parent."

■ Just as a finding of unfitness under section 1(D)(m) of the Adoption Act will not be disturbed by a reviewing court unless it is against the manifest weight of the evidence, a finding under section

2—29(2) of the Juvenile Court Act that it is in the best interest of the minor that a guardian be appointed and authorized to consent to the adoption of the minor also will not be disturbed unless that finding is against the manifest weight of the evidence. Ill. Rev. Stat. 1989, ch. 37, par. 802—29(2).

■ Our review of this record demonstrates that the trial court's finding on this point was not against the manifest weight of the evidence. Indeed, other than the vague hope that perhaps some day Leslie will possess the strength of character to overcome her drug abuse—the root cause for the removal of her children into foster homes in the first place—there is no evidence whatsoever to suggest that the appointment of a guardian with authority to consent to the adoption of these children was *not* in their best interests.

Given the stakes at issue, proceedings seeking to terminate parental rights must be handled with the greatest care. Because no two cases are ever precisely the same, the trial courts are expected to assess carefully the particular circumstances of each individual case.

■ In the present case, Leslie argues that the trial court abused its discretion by refusing to grant a 60-day continuance of the dispositional hearing on the question of whether Leslie's parental rights should be terminated as to the two youngest children after she had been found to be an unfit parent. We disagree, noting that the decision to grant or deny a continuance is left to the sound discretion of the trial court. Indeed, we view with skepticism motions, such as that made here, that a dispositional hearing be continued after a finding of parental unfitness in the hope that perhaps some evidence can be shown that the movant's parental rights need not be terminated. Such a motion could be made in every case and would have equal validity for requested continuances of 60 days or 6 months. By setting forth a time frame of 12 months after adjudication for a parent to make "reasonable progress" toward the return from foster care of a child found to be neglected or abused, the legislature intended, with good reason, that proceedings involving the termination of parental rights be handled with dispatch. The legislature also intended to give parents a reasonable time to correct the errors of their ways. Typically, as in this case, some or all of the children are of tender years, making them more attractive for adoption than they would be at an older age, and increasing the likelihood of a successful bonding with their adoptive parents at that younger age as well. There is certainly no abuse of the trial court's discretion in this case in denying a continuance of the dispositional hearing as to the two youngest siblings.

■ We note that the trial court did grant the request for a contin-

uance of the dispositional hearing regarding the oldest child, nine-year-old KW. Yet at the subsequent dispositional hearing conducted after that continuance, the court found that it was in the best interest of KW that a guardian be appointed to consent to his adoption as well. The court noted at this hearing that, once again, the parents were talking about getting straightened out "tomorrow" or "soon." However, the evidence demonstrated that the parents' circumstances had not improved during the continuance. We agree and find that the court's order regarding the appointment of a guardian for KW with authority to consent to his adoption is not against the manifest weight of the evidence.

■ Leslie also argues that the trial court's appointment of a guardian for KW with authority to consent to his adoption was in error because the DCFS update report filed for that hearing stated that KW was trying to render himself "unadoptable." The pathetic and unsurprising posture of this nine-year-old child is precisely the reason why courts must act, if at all possible, to terminate parental rights in appropriate cases before the children involved reach an impressionable age. The record shows that the trial court was fully aware of this heart-wrenching situation, but concluded that KW's best interests lay nonetheless in the hope that at some point he would make "the decision to accept the alternative family since he'll then know he can't have the one he dearly wants." We recognize the difficulty of the decision the court was confronted with, but we view this case essentially as one in which the court appropriately declined to delegate its judgment to a nine-year-old child. The court was fully justified in taking the action it did.

### III. THE TERMINATION OF THE PARENTAL RIGHTS OF WALTER SMITH

Respondent father, Walter Smith, argues that the trial court erred in finding that he was an unfit parent pursuant to section 1(D)(m) of the Adoption Act because he was not the parent who was found to be neglectful of the children to begin with, thereby causing their placement in a foster home. Walter also argues that even if the provisions of section 1(D)(m) are applicable to him, the finding that he was an unfit parent was contrary to the manifest weight of the evidence. Last, Walter argues that even if the trial court properly found him to be an unfit parent, the court erred in finding that it was in the best interest of KW, Walter's nine-year-old son, that a guardian be appointed with authority to consent to his adoption, thereby terminating Walter's parental rights as to KW. We will address these arguments in turn.

A. *The Applicability of Section 1(D)(m) to a Parent Who Is Not the Parent Who Earlier Had Been Found To Be Abusive or Neglectful.*

As previously noted, the trial court's findings in 1988 that the three children of Walter and Leslie Smith were neglected minors were based entirely upon allegations regarding Leslie's conduct. Walter was not mentioned at all in a petition alleging neglect. At the time that petition was filed on May 12, 1988, Walter was a work-release prisoner in the Urbana Community Correctional Center of the Illinois Department of Corrections.

Walter claims that a finding of parental unfitness pursuant to section 1(D)(m) of the Adoption Act "presupposes that the parent found unfit was first found to have neglected said minor(s)" under the Juvenile Court Act. Because no allegations or findings of neglect were ever made against Walter, he argues that the State cannot then seek to terminate his parental rights pursuant to section 1(D)(m). We disagree.

We first note that Walter was a party to the underlying neglect proceedings. Walter was duly served with summons, appeared, had counsel appointed for himself, and participated in both the adjudicatory and dispositional hearings leading to the court's finding that his children were neglected minors and the orders making them wards of the court.

■■ Section 2—23(1)(a)(2) of the Juvenile Court Act (Ill. Rev. Stat. 1989, ch. 37, par. 802—23(1)(a)(2)) states that minors under 18 years of age found to be neglected may be placed in accordance with section 2—27 of the Juvenile Court Act. Section 2—27(1) provides that the court may commit a minor adjudged a ward of the court to DCFS for care and service if the court finds that:

> "[T]he parents, guardian or legal custodian of a minor adjudged a ward of the court are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that appropriate services aimed at family preservation and family reunification have been unsuccessful in rectifying the conditions which have led to such a finding of unfitness or inability to care for, protect, train or discipline the minor, and that it is in the best interest of the minor to take him from the custody of his parents, guardian or custodian ***." (Ill. Rev. Stat. 1989, ch. 37, par. 802—27(1).)

Thus, even when the court has, as here, found one parent to be the cause of the neglect of the children, the court may not place those children with DCFS unless the court first finds that the second parent, living apart from the first parent, is also "unfit or *** unable *** to

care for, protect, train or discipline" the children or is "unwilling to do so."

In the present case, consistent with these statutory requirements, the court at the dispositional hearing on July 26, 1988, placed the children in the custody of DCFS and specifically found not only that the respondent mother was unfit for reasons other than financial circumstances alone to care for, protect, train or discipline the children, but also found that the respondent father was unable to do so.

Even though not required for our resolution of this issue, we note that Walter was personally put on notice by the court at the dispositional hearing that his parental rights could be terminated if he failed to make reasonable progress to have these children returned from foster care. The court even specifically warned him that he may be looking at the "very unpleasant choice" of living with his children or living with his wife.

■■ Just as section 2—27 of the Juvenile Court Act provides that the court must find some parental deficiency in both parents if they live apart before children found to be neglected may be placed with the Department of Children and Family Services, section 1(D)(m) of the Adoption Act contemplates that one parent *or the other* must either make reasonable efforts to correct conditions which were the basis for the removal of the children or make reasonable progress towards the return of the children within 12 months after an adjudication of neglect. To hold otherwise might add years to the procedures contemplated by the legislature in which parents of neglected children are given a set time in which to correct serious parenting deficiencies before their parental rights may be terminated.

■■ ■ We find support for this conclusion in section 2.1 of the Adoption Act (Ill. Rev. Stat. 1989, ch. 40, par. 1503), which states the following: "This Act shall be construed in concert with the Juvenile Court Act of 1987, the Child Care Act of 1969, and the Interstate Compact on the Placement of Children." One of the purposes of the Juvenile Court Act is to provide a stable, secure, and loving environment for all children subject to its provisions, and "in cases where it should and can properly be done to place the minor in a family home so that he or she may become a member of the family by legal adoption or otherwise." (See Ill. Rev. Stat. 1989, ch. 37, par. 801—2.) We also note that the Juvenile Court Act contemplates that a parent shall be a respondent in all proceedings conducted under that Act and shall have the right "to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and *** to be represented by counsel." See Ill.

Rev. Stat. 1989, ch. 37, par. 801—5(1).

■■ Because the Juvenile Court Act intends the involvement of a parent in all proceedings under the Act, and because Walter actually participated in the underlying neglect proceedings through which his children were placed in foster homes, we conclude that Walter was fully subject to the requirements of section 1(D)(m) of the Adoption Act regarding "reasonable progress" he had to demonstrate or risk having his parental rights terminated.

■■ Before concluding this discussion, we emphasize that the term "unfit" means very different things when used in the Juvenile Court Act than it does when used in the Adoption Act. Under section 2—27(1) of the Juvenile Court Act, a court needs to determine whether a parent, guardian, or legal custodian is "unfit" to care for, protect, train or discipline the minor before the court may place that minor out of the home of such parent, guardian, or legal custodian. The term "unfit" under section 1(D) of the Adoption Act signifies, however, not merely a parent from whom a child may be temporarily removed and placed in foster care, but a parent who is unfit to have any further parental relationship with the child in question. (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D).) Because the same term—"unfit"—is used in both section 2—27(1) of the Juvenile Court Act and section 1(D) of the Adoption Act, it is important for the court and counsel in juvenile court proceedings to be aware of the different meanings of that term depending upon which Act is then involved in the court proceedings.

B. *The Trial Court's Finding That Walter Had Not Made "Reasonable Progress" Toward the Return of the Children.*

Walter next argues that the trial court's finding that he failed to make reasonable progress towards the return of his children from foster care is contrary to the manifest weight of the evidence. In support of this argument, Walter claims that he could not be expected to make much "progress" within the meaning of section 1(D)(m) of the Adoption Act because he was an inmate of the Illinois Department of Corrections on June 22, 1988, the date of the adjudicatory hearing, when his three children were found to be neglected minors. This argument, however, fails to take into consideration Walter's peculiar status as an inmate, namely, that he was a work-release prisoner at the Urbana Community Correctional Center.

The evidence shows that as a work-release prisoner, Walter was able to have extensive contact with Leslie and his children. In July 1988, weekly visits were arranged by DCFS workers for Walter and Leslie to meet with the children every Thursday night at the Urbana

Community Correctional Center. In October 1988, Leslie had an apartment for herself and Walter on North Fifth Street in Champaign, and Walter was permitted to go to that apartment two evenings a week for six hours at a time. The weekly visits with the children were moved in October 1988 to the apartment on North Fifth Street. These visits were normally two hours long. Walter was also released from the correctional center during the day in order to continue his employment. In the late fall of 1988, Leslie entered the residential detoxification program of Prairie Center, and after approximately 30 days, she returned to the apartment on North Fifth Street. In the spring of 1989, the power in this apartment was turned off, and the visits were moved to Leslie's grandmother's home.

Evidence presented at the adjudicatory hearing on the petition to terminate parental rights showed that DCFS workers constantly admonished both Walter and Leslie regarding the need to establish a drug-free environment for their children before the children could be returned. However, following Leslie's inpatient treatment at Prairie Center, she did not pursue the outpatient treatment necessary for her to control her drug-abuse problem.

The record reveals that Walter was in almost weekly contact with DCFS workers from the June 1988 adjudicatory hearing in which his children were found to be neglected until the September 1989 filing of the petition to terminate his and Leslie's parental rights. In July 1989, DCFS workers informed Walter that if he was requesting the return of his children, he could not allow Leslie to reside in the home he established until she was able to verify that she had successfully completed drug-abuse programs and no longer had a drug-abuse problem.

In the summer of 1989, Leslie moved into an apartment on North Fourth Street, and serious problems regarding visitation with Leslie at that residence began to occur. These problems were suggestive of Leslie's continued drug abuse, and on June 15, 1989, a counselor at Prairie Center evaluated Leslie as "once again cocaine dependent."

On August 19, 1989, a Champaign police officer had occasion to accompany Robert Mason to the North Fourth Street apartment in which Mason was living, along with Leslie and Jacqueline Frazier, so that Mason could recover some of his property. When the officer entered the apartment, he saw a table with a mirror on it that contained a white powdery substance. Also present on the mirror were a spoon, wire, and assorted drug paraphernalia. A second mirror had a razor blade on it. When the officer found some baggies containing a white powdery substance that tested positive for cocaine, Frazier was arrested.

Other evidence before the court showed that Walter often had weekend passes away from the Urbana Community Correctional Center, in addition to the two weekday passes each week. During the time that Walter was on authorized leave away from the Urbana Community Correctional Center, he was residing, and spending his time, with Leslie. Given all of the circumstances in this case, Walter clearly was aware of (1) the basis for the court's finding that his children were neglected, (2) the reasons why the court determined that his children should be placed in foster homes away from the parents, (3) the steps that either he or Leslie or the both of them together needed to take within 12 months of the adjudication of neglect in order for his children to be returned from foster care, (4) the ongoing support and assistance being provided on a weekly basis by DCFS workers in an effort to assist Walter and Leslie in meeting the requirements set by the court for the return of their children, (5) Leslie's failure to appropriately address her drug problem, and (6) the consequences if Walter did not establish an appropriate drug-free residence to which his children could be returned.

We also note the remarks of the trial court on July 6, 1989, at a routinely scheduled review hearing at which the court reviewed the circumstances of its wards, Walter's and Leslie's children, in their placement out of the parental home. At that hearing, the court addressed both Walter and Leslie and pointed out that the assistant State's Attorney had indicated that unless their circumstances improved, the State would be filing a petition to terminate their parental rights. The court once again explained the seriousness of that action and encouraged Walter and Leslie to take steps to ensure that it did not become necessary. The court told both parents that there could be no more missed appointments, no more missed counseling sessions, and no more difficulty by DCFS in contacting them. The court also directed Leslie once again to pursue a regular course of outpatient treatment in order to address her drug problem.

In part II A of this opinion, we quoted at some length from the trial court's findings regarding Leslie's failure to make reasonable progress for the return of the children. Without quoting those remarks again, we simply note that some of those remarks are applicable to Walter as well. In addition, the court stated the following regarding Walter:

> "For the respondent father, it boils down to this. Obviously I can't return custody of any of the children to him today because he's living with the respondent mother. He's working, so in effect I would be returning custody of the children to the respond-

ent mother, which again, I don't believe I could responsibly or reasonably do. *** [H]e places me in a position today where to return custody of these children to him is to return custody to the respondent mother. He's living in a hotel with her. Obviously I can't do that.

Now, I would expect that during all of this time he was attending the group sessions as part of his work release from the Urbana Community Correctional Center all the time he was working with the family aid specialists *** and going through individualized parent training, I would expect that during all of that time he gained some understanding and some appreciation of the devastation that has been heaped upon his family by drug abuse, particularly that of the respondent mother. I would expect that he would come to understand how emotionally that destroys children, how these children can't possibly grow up successfully in a home where one of the parents is abusing drugs. *** However, judging by the fact that he has now been at liberty for a month, and judging by the fact that even before he was completely released from the correctional program he was spending more time at home than he was in the correctional center, he resides with the respondent mother. That tells me one of two things. Either he didn't learn what drug abuse does to children and drug abuse does to families and what happens to children that have to grow up in homes where drugs are being abused, and if he didn't learn it then he hasn't made reasonable progress because he wasn't paying attention; if he learned it, he's not acting on it, because he's leaving me in a position where I would have to return the children to a parent and to a home—to a parent who is abusing drugs and a home where drugs are being abused, in which case that's not reasonable progress either. It is the responsibility of the parent to make reasonable progress. It's the responsibility of the parent to supply the court with a safe home for the children. He hasn't done that *** ."

We conclude that the above findings of the court are reasonably based upon the evidence presented at the adjudicatory hearing on the petition to terminate parental rights and are not against the manifest weight of the evidence. *Boolman*, 141 Ill. App. 3d at 511, 491 N.E.2d at 3.

As a possible explanation for Walter's failure to take appropriate action to establish a drug-free home to which his children could return, we note that evidence presented at the dispositional hearing on the

question of parental termination revealed that Walter still believed that the drug-abuse counselors at Prairie Center "greatly exaggerated" the extent of Leslie's cocaine abuse.

The opinion of this court in *In re E.J.F.* (1987), 161 Ill. App. 3d 325, 514 N.E.2d 544, supports our position that Walter's incarceration (such as it was) is not an excuse for his failure to make "reasonable progress" toward the return of the children from foster placement. In *E.J.F.*, the respondent parent, who was suffering from a mental illness, had spent several months in the county correctional center after the respondent minor had been found to be neglected and placed in a foster home. (*E.J.F.*, 161 Ill. App. 3d at 325, 514 N.E.2d at 546.) Respondent mother argued that her period of incarceration should not be included in the 12-month period under section 1(D)(m) of the Adoption Act in which she had to show "reasonable progress" to avoid having her parental rights terminated. In response to that argument, this court stated the following:

> "The legislature recognized the interests of both parents and children in setting a specified period of time [in section 1(D)(m) of the Adoption Act]. The parents are required to make progress in returning the child to their home. They must do so within a reasonable period of time in order to allow the child the opportunity to be raised in a normal family setting. It is unfortunate that respondent spent several months in the county correctional center without treatment. As for her minor son, the clock did not stop while she was incarcerated. The minor has continued to grow and develop, needing the nurture and care of parents. Respondent's rights as the natural mother of E.J.F. are important, and a decision to terminate those rights must be made with due care for those rights. The legislature determined that 12 months is a reasonable period to wait for the parent to make demonstrable progress before a finding of unfitness can be made. In this case, the 12-month period passed before the hearing was held on the petition to terminate parental rights. *Respondent's interest does not outweigh the interest of the minor in having a chance for a normal home environment.*" (Emphasis added.) (*E.J.F.*, 161 Ill. App. 3d at 330, 514 N.E.2d at 548.)

We reaffirm the views expressed in *E.J.F.* and find them applicable to Walter's case.

The abuse of drugs had been ongoing in the lives of Walter and Leslie for many years prior to the court proceedings in 1988 and 1989. Walter not only was a user of drugs, he was convicted of possession of

cocaine with intent to deliver and sentenced to prison. The extent of Leslie's drug abuse and the extent to which drugs and drug paraphernalia infested their residence have already been described. Given this background, we think the trial court acted appropriately in warning Walter that a drug-free environment would have to be obtained by him before his children would be returned to him, specifically including the exclusion of Leslie from that environment if, as proved to be the case, she was not able to control her drug abuse.

In *In re A.D.* (1990), 199 Ill. App. 3d 158, 556 N.E.2d 799, this court recently dealt with a juvenile court proceeding (although one not involving termination of parental rights) in which we approved trial court orders that in effect required one parent to establish a residence independent from the other parent until and unless the other parent had taken and successfully completed affirmative steps to address the perverse behavior which was the cause of the removal of the children from the home in the first place. In *A.D.*, we noted that the children involved were entitled to no less, and we emphasized that, "only the courts of this State, through proceedings under the [Juvenile Court] Act, can protect \*\*\* children from their abusive or neglectful parents." (*A.D.*, 199 Ill. App. 3d at 161, 556 N.E.2d at 801.) These same concerns are applicable to the present case.

C. *The Trial Court's Finding That It Was in the Best Interests of the Minors That Walter's Parental Rights Be Terminated.*

Last, Walter argues that the determination at the dispositional hearing that it was in the best interest of KW that Walter's parental rights be terminated was contrary to the manifest weight of the evidence. The argument Walter makes on this point is essentially the same argument made by Leslie, and for the same reasons we rejected Leslie's argument, we reject Walter's. We conclude that the trial court acted appropriately in finding that it was in the best interests of all three children that Walter's parental rights be terminated and a guardian appointed to consent to their adoption.

For the reasons stated, the judgments and orders of the circuit court are affirmed.

Affirmed.

GREEN and McCULLOUGH, JJ., concur.